Filed 3/8/21  P. v. Way CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C085784 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F05913) |
| v. | |
| LATRALE DUPREE WAY, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C085813 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F05913) |
| v. | |
| ANTHONY MAURICE COTTON, | |
| Defendant and Appellant. | |

Defendants Latrale Dupree Way and Anthony Maurice Cotton were tried together and convicted of numerous crimes committed during a four-month crime spree in the summer and fall of 2014 in and around the North Highlands and Antelope areas of Sacramento County. Both appealed, and we consolidated the appeals for the purpose of oral argument and decision.

On appeal, both defendants assert: (1) the evidence was legally insufficient to support the verdict on count one, kidnapping to commit robbery; (2) the conviction on count two should be reduced from first to second degree robbery because the evidence was insufficient to establish that the robbery occurred inside an inhabited dwelling house; and (3) the matter must be remanded following the enactment of Senate Bill No. 620 to afford the trial court the opportunity to exercise its discretion to strike firearm enhancements.

Way further asserts: (4) his conviction on count thirteen of aggravated kidnapping was not supported by substantial evidence; (5) because the convictions on counts one through five rested entirely on eyewitness identifications, and because the identifications were inherently unreliable, substantial evidence did not support these convictions; (6) the conviction on count eighteen was not supported by substantial evidence for the same reason; (7) his trial attorney was constitutionally ineffective for failing to call an expert witness to testify about the inherent unreliability of eyewitness identifications; and (8) his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. Cotton further asserts: (9) his transfer hearing pursuant to Proposition 57 was defective and the juvenile court's determination to transfer him to adult criminal court was not supported by substantial evidence; and (10) the natural and probable consequences doctrine impermissibly extends aider and abettor liability in violation of due process and the trial court's instruction on that doctrine requires reversal.

We find merit only in Way's Eighth Amendment claim. We will vacate his sentence and remand the matter to the trial court for resentencing consistent with this opinion. Otherwise, we affirm the judgments.

FACTS AND PROCEDURAL HISTORY

Defendants were charged in a 20-count second amended information. Both defendants were charged with: kidnapping to commit robbery (Pen. Code, § 209, subd. (b)(1) [statutory section references that follow are to the Penal Code unless otherwise stated]; count one), robbery in the first degree (§ 211; counts two, three, seven), first degree residential burglary (§ 459; count four), assault with intent to commit rape (§ 220; count five), and robbery in the second degree (§ 211; counts fifteen, seventeen, eighteen). Way was additionally charged with: first degree residential burglary (§ 459; count six), robbery in the second degree (§ 211; counts nine, ten), sexual penetration (§ 289, subd. (a)(1); count eleven), rape (§ 261; count twelve), kidnapping to commit robbery (§ 209, subd. (b)(1); count thirteen), kidnapping to commit rape (§ 209, subd. (b)(1); count fourteen), and sexual battery (§ 243.4, subd. (a); count sixteen).

Cotton was also charged with: first degree residential burglary (§ 459; count eight) and discharging a firearm at a vehicle (§ 246; count nineteen). Count nineteen was later dismissed on the prosecutor's motion.

In connection with counts two, ten, twelve, thirteen, and fourteen it was further alleged that defendants were armed with a firearm within the meaning of section 12022.53, subdivision (b).

In connection with counts three, five, seven, and nine, it was alleged defendants were armed with a firearm within the meaning of section 12022, subdivision (a)(1).

In connection with count eleven, it was alleged that Way personally used a firearm within the meaning of section 12022.53, subdivision (b), and that he used a deadly weapon within the meaning of section 12022.3, subdivision (a).

In connection with count fifteen, it was alleged that Cotton was armed with a firearm within the meaning of section 12022, subdivision (a)(1), and that Way personally used a firearm within the meaning of section 12022.53, subdivision (b).

In connection with count seventeen, it was alleged that Way was armed with a firearm within the meaning of section 12022, subdivision (a)(1), and that Cotton personally used a firearm within the meaning of section 12022.53, subdivision (b).

In connection with count eighteen, it was alleged that Cotton personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), and that Way personally used a firearm within the meaning of section 12022, subdivision (a)(1).

## The Prosecution Evidence

### Victims J.H., E.H., and I.H.

On June 30, 2014, at approximately 9:00 p.m., J.H. took his trash cans to the curb in front of his house. His adult daughter, E.H., was inside with her three children, and his son I.H. was also inside. J.H. started back towards his house when he saw four African-American males on the sidewalk walking towards him. At least two of them wore hoods and had their faces covered. One of them wore a plaid shirt to cover his face. One of the men pointed a gun at J.H.'s head. One of the men grabbed J.H. by his head and forced his head towards the ground. The person holding a gun put it to J.H.'s head. Others searched J.H.'s pockets. They took his cell phone, wallet, and the keys to his Honda.

The men took J.H. into his house through the garage. Once they were inside, J.H. could see the perpetrators better because "inside the house they were not covered anymore in the face." The one with the gun asked J.H. where he could find guns and jewelry but J.H. said he did not have either. The men lifted the mattress in the master bedroom looking for guns. Two of the assailants searched the bedrooms while the other two, including one with a gun, took J.H. to the living room.

4

E.H. was in the kitchen when she saw someone pointing a gun at her. The person was African-American and he had dreadlocks and a shirt covering the lower part of his face. He told her to go to the living room. There, E.H. saw someone holding J.H. at gunpoint. The intruders told everyone to get on the ground. E.H. grabbed her six-month-old baby and got on the floor.

Two men stayed in the living room with the family while the others searched throughout the house. J.H. only saw one of the men with a gun, but E.H. testified that both men in the living room had handguns. I.H., who was 14 at the time of trial and approximately 12 at the time of the home invasion, saw at least two guns during the incident. The men told the family to be quiet or they would shoot everyone.

The two intruders who had been searching the bedrooms returned to the living room. One of the men approached E.H. and put his hand down her shirt. One of the men said, "you look cute," or "she's cute." One of the men touched E.H. "[i]n [her] butt." Another said they should make E.H. take her clothes off. One of the men pointed a gun at E.H.'s head and told her to put the baby down, so she gave the baby to J.H. and stood up. The men surrounded E.H. They told her to take her clothes off. She refused. All four men then took off E.H.'s shorts and underwear. She fell back onto a sofa and the men grabbed her legs.

J.H. believed that the men were going to rape E.H. As the men focused on her, he ran to the front door and outside to get help. The man with the gun said, "stop or I'll shoot."

After J.H. ran out of the house, the men collected everything they could and ran outside. They took video cameras, a tablet, and a small chest containing antique coins from J.H.'s bedroom. The tablet had been on a nightstand. They also took J.H.'s and his wife's wedding bands. One of the men reached into I.H.'s pocket and took his inhaler. Outside, J.H. saw the men run out of the house. They ran to a corner where they jumped into a dark sedan and drove away.

5

E.H. also ran outside, hoping to use a neighbor's phone to call for help. She saw a woman on the street and the woman let E.H. use her phone. E.H.'s 911 call was played for the jury. She told the 911 dispatcher, "four guys just came into our house, young like teenager, black guys, they started taking everything from inside my dad's house and they had us all like at gunpoint, I don't think they were real, um, they had me on the floor and they tried to make me take off my c- my clothes." E.H. said they "each had a gun," although at trial she testified that she did not remember saying that, and remembered that two of the men had guns. She said that one of them said he was going to shoot her if she did not take off her clothes. She continued, "they all started surrounding me liked [*sic*] if they were gonna sexually assault me when I think n- they weren't paying attention and my dad ran out the door and hit the neighbor's house to get help, and they all saw and they just grabbed everything and ran . . . ."

I.H. had hidden his phone under the couch. After everyone ran out, he called 911. I.H.'s 911 call was also played for the jury. During the call, I.H. reported that four or five African-American men had entered the house from the garage. I.H. said he saw two handguns.

At trial, J.H. identified defendants as two of the intruders. He also acknowledged that, sometime after the incident, he viewed photo lineups. He circled and initialed a photo in each photo lineup. In one lineup, he identified Cotton. However, in the lineup including Way's photograph, he selected a filler photo.

At trial, E.H. identified defendants as two of the intruders. She testified that, during the incident, all four of the intruders had at least part of their faces covered, "just like the mouth." However, when questioned about her identification of Way, she testified that the "top of their faces look familiar. Like I said, it was only the mouth part, like you could see everything else."

6

E.H. also testified that, months after the incident, she viewed an in-person lineup. She was not able to identify Cotton. She also viewed a photo lineup. She circled number two, which was Way. However, she acknowledged that she was not 100 percent certain.

Crime scene investigators lifted a fingerprint from a nightstand in J.H.'s bedroom. The fingerprint was a match to Cotton's right middle finger.

An investigator from the prosecutor's office took measurements at J.H.'s house. When he first was confronted by the home invaders, J.H. was approximately 29 feet from the door in the garage that led into the house.

Victim I.S.

On July 13, 2014, I.S. went to church with his family. When they returned home, I.S. noticed the door leading from the garage into the house was open. A sliding door in the kitchen was also open. I.S. also found a window open with the screen removed. In the master bedroom, he saw that the mattress had been moved and the dresser drawers were pulled out. I.S. discovered there were laptops, video cameras, and an iPad missing. Fingerprints were lifted from the interior and exterior of the office window and from a piece of glass in the office. Latent prints from each of these surfaces matched Way's prints.

Victim S.L.

On the morning of July 14, 2014, S.L. took his garbage to the curb. He walked back through the garage and into the house. He then heard the door leading from the garage into the house opening. He went into the living room, where he encountered three black males. One of the men had a gun. They ordered S.L. to the floor. The man with the gun pointed it at S.L.'s forehead and when S.L. lay down on the floor, the man pointed the gun at the back of his head. Another man demanded money. S.L. told the men his wallet was in his car. One of the men ran to the garage, while another went

upstairs. The man with the gun had S.L. stand up and go up the stairs while walking behind him.

At one point, S.L. noticed the gunman's attention was focused on one of his confederates. Fearing that the men would shoot him once they "finish[ed] their business," S.L. grabbed the gun with both hands and pointed it toward the ceiling. S.L. and the gunman struggled for control of the gun. The intruder who was upstairs saw this, came to where the two men were struggling, and punched S.L. at least twice. The third man came back into the house from the garage. S.L. let go of the gun and ran into one of the upstairs rooms. He closed the door, opened a window, and yelled for help. All three men then ran out of the house and to an older, "bluish silvery" four-door car.

The men had taken S.L.'s wallet from his car, which contained about $400 or $500, his driver's license, credit cards, and receipts. They also took his cell phone and laptop. At trial, S.L. identified both defendants "without hesitation."

On the same day, a motorist found a wallet in the gutter in North Highlands. There was no money in the wallet, but it did contain a driver's license, a couple of cards, and a couple of receipts. A fingerprint lifted from one of the receipts matched Way's right middle finger.

Victim A.S.

On a Sunday morning, A.S. and her children went to church. When they returned, A.S. noticed that the door leading from the garage into the house was open and broken. Another door leading from outside into the garage was also broken. Inside, the house was "messy, ransacked." Items from the closets were on the floor and drawers were pulled out and dumped onto the floor. A.S. discovered that video game systems, televisions, laptops, luggage, and jewelry had been taken. Several latent prints lifted from surfaces in A.S.'s house matched Cotton's prints.

Victims <u>A.P.</u> and <u>M.T.</u>

A.P. and M.T. had known each other for 20 years.  On the night of October 3, 2014, A.P. picked M.T. up and they went to Robert Frost Park.  When they arrived at the park, at approximately midnight, M.T. walked off to urinate while A.P. went to a gazebo to wait for him.

Before he could join A.P., someone approached M.T., pulled out a weapon, and told M.T. to give him his stuff.  There were two other people with him.  M.T. agreed and said, "don't shoot me, brother," and the person responded, "we are not going to shoot you, just give me your stuff."  Asked how many of the perpetrators had guns, M.T. testified, "The one pulled out a gun.  The other one had his gun with him, and then the one that stayed with me . . . he had the gun because he put it on me.  He put it on my back."  M.T. gave the man everything including his phone, chains, keys, wallet, phone, his "grill" from his teeth, and even his clothes.  At some point, the men saw A.P. and, while one of them stayed with M.T., the other two went towards A.P.

A.P. realized that there were two African-American men coming towards her, and when she looked toward M.T., she saw that he was stripped naked on his knees with a gun pointed at his head.  One of the men grabbed A.P.'s phone.  He then pulled out a gun.  The man with the gun, Way, repeatedly said he wanted to have sex with A.P. and began to grope her.  He put his hands in her shirt, touching her breasts beneath her bra, and down her pants.  He put his finger in A.P.'s vagina for 10 to 15 seconds.

The men were trying to figure out if A.P. had anything of value but she did not.  She suggested they take her car.  Way stayed with her while the others ransacked her car, but they did not find anything.  A.P. said she had a student Visa and told them she could try to "pull money off of it."  One of the men told Way, "take her to go get the money off her Visa, and if she doesn't, then off her," meaning kill her.  A.P. just wanted "to get away from them all together and . . . get home to my kids."

9

A.P. and Way got into her car. Way directed A.P. to an ATM. Once at the ATM, A.P. told Way she did not know her PIN. He responded, "okay, I don't want your money then. You have kids, so we are going to go. I'm going to take you somewhere else." He said he still wanted to have sex with her. He directed A.P. where to go.

At some point, Way told A.P. to stop. He said he wanted to have sex with her, but he did not want to leave any DNA. Way directed A.P. to get into the back seat. Way wanted to have sex with A.P. from behind, but she refused, thinking that it would be too easy for him to kill her if she was facing away from him. Instead, A.P. suggested, "we'll just sit here." Way found a Target bag, put the Target bag on like a condom, and "had [A.P.] climb on top of him." Way had put the gun on the ground and A.P. relented because, unlike facing away from him, she "could sort of feel like [she] was in control if anything was to happen because the gun was there and his hands weren't close to it."

Way had sex with A.P. After a minute or two, Way got anxious and said he had to go. He had A.P. drive him to Roseville Road and let him out. He took A.P.'s wallet and told her that if she told anyone what had happened, he would kill her children and her husband. A.P. testified that, while she did what Way told her to do, she was not agreeing to it, but rather "just like surviving."

Worried M.T. might be dead, A.P. returned to the park, but she could not find him. Before she could figure out what to do next, the police arrived.

M.T., meanwhile, had been knocking on doors in the neighborhood until he finally got someone to call the police for him. By the time he returned to the park, the police were there.

Police asked A.P. to go to a hospital to "do the rape kit." DNA in sperm fractions found in both vaginal and anal swabs matched Way's DNA. DNA found in A.P.'s underwear also matched Way's DNA.

A.P. and M.T. viewed a live lineup. Both were unable to pick Cotton out of the lineup. M.T. also viewed a photo lineup, but was unable to pick Way out of the lineup,

10

and instead picked a filler photograph. A.P. reviewed a photo lineup, and she believed that she "saw the person" who raped her. She chose Way out of the photo lineup.

Victims Q.J. and M.S.-B.

On the night of October 19, 2014, Q.J. was in Robert Frost Park talking with her boyfriend M.S.-B. Four people approached on bikes and scooters, at least three of whom had guns according to Q.J. They made Q.J. stand up and checked to see if she had anything. They took her phone and asked if she had money. Q.J. said no, forgetting that she did have money. Way, who was one of the individuals who had a gun, reached down her shirt into her bra and took seven or eight dollars that she had there. He then stuck his hand down her pants like he was trying to touch her "private area," and she took his hand out of her pants. He did not penetrate her vagina.

Cotton, meanwhile, was interacting with M.S.-B. Someone told M.S.-B. to empty his pockets, but he did not have anything. According to Q.J., "one tried to get [M.S.-B.] shot . . . . [T]he dude was just like trying to make up a story like he robbed my sister, yeah, that's the one, shoot him, he fought me, he beat me up. And [M.S.-B.] was like I've never seen you in my life." However, someone in the back of the group said M.S.-B. "didn't do that" and urged the group to leave. Cotton was the one who was trying to fight with M.S.-B.

At one point, the group became focused on a vehicle parked near the park. As they started to move towards the vehicle, Q.J. and M.S.-B. ran.

Q.J. testified that, while she did not know any of the perpetrators' names, she knew "faces, you know, people around. You know, you see people, stuff like that. I know of them and I know them. I don't know if they know me, but I know of them . . . ." She testified that "we all have like similar friends. I mean, I've seen [Way] before. I mean, just -- it was just all similar friends, acquaintances that we've all hung out with before. We all know each other."

11

When Q.J. got home, using Facebook, she "pulled up everybody that I seen before, and it made it a little bit easier because I remember faces just not names." She found the profiles for both defendants. When Q.J. spoke to police later, she showed them the Facebook pages on a laptop. Q.J. also testified that she knew Way by the nickname "Dump Truck," and she provided police with that information.

A deputy ran the nickname "Dump Truck" through a known persons file on his patrol vehicle's computer, and it returned one person: Way. Q.J. looked at the computer screen when Way's picture was displayed and said, "oh my God, that is him, that is 100 percent the guy that robbed me."

At trial, Q.J. and M.S.-B. identified both defendants as two of the perpetrators. M.S.-B. further testified that he viewed a photo lineup at his house at some point after the incident. Within seconds, he identified Cotton as the one who approached him and searched his pockets. Shown the same photo lineup, Q.J. also identified Cotton as the person who searched M.S.-B.

Victim W.E.

Also on the night of October 19, 2014, W.E. drove to Robert Frost Park. He parked his car on the street by the park. At some point, W.E. noticed someone standing next to the driver's window. The person demanded W.E.'s wallet, money, and everything else. A second person was "going back and forth" giving orders, and two other guys were attempting to remove bicycles strapped to a bike carrier on the back of the car. At trial, W.E. identified Cotton as the person who came to his window and Way as the person who was giving the orders. Cotton pulled out a gun and hit W.E. in the face with it. W.E. handed over his wallet, and then he reached into his pocket, grabbed his keys, and attempted to start the car. Cotton hit W.E. in the face with the gun again. The two men behind the car managed to free the bikes from the bike carrier. W.E.'s rings and necklaces were also taken.

12

W.E. testified that, before the men left, "the guy said shoot him, and [Cotton] looked at me for a minute, he pointed the gun my way and he turned and shot my tire."

Days later, W.E. viewed photo lineups. In one photo lineup, he picked out Cotton as the person who hit him with the gun. In the other photo lineup, he said Way looked familiar.

<u>Defense</u> <u>Evidence</u> <u>Presented</u> <u>by</u> <u>Way</u>

Way acknowledged burglarizing I.S.'s house, where his fingerprints were found. He testified that he was alone at the time.

Way denied going into S.L.'s house and robbing him. Way testified that he found the wallet, went through it, and discarded it, explaining his fingerprint on the receipt.

Way testified he played no role in the robbery at J.H.'s house or in the robbery of W.E. He testified that he was not present in either case.

With regard to Q.J. and M.S.-B., Way acknowledged being at the park that night. Way testified that he did not take anything from Q.J. Rather, "she handed it to" him. He testified that she reached into her bra, took out money, and gave it to him. He also testified that he patted her pants down, but he did not stick his hand in her pants. Way testified that he did not have a gun.

Way testified that M.T. had wanted to buy a half pound of marijuana from him but did not have enough money. Way told M.T. to "give me what you got." Way denied having a gun that night. As for A.P., she saw "things were getting heated" between Way and M.T. She told Way that she had money in the bank and that she would take him there. Once they got to the ATM, however, A.P. told Way she did not know her PIN. Way told A.P. to take him back to the park.

While they were driving, Way said he "would like to hit that," in a "good nature" "goofy" way. She asked what Way was going to do about M.T. and Way responded he was going to take property from him for wasting his time. A.P. asked him not to. Way

13

"offered her a way of payment," and she agreed. They parked the car and got into the back seat together. Because Way did not know A.P., he picked up a bag to use as a makeshift condom. A.P. then climbed on top of Way and they had sex. Way testified that the sex with A.P. was consensual.

Cotton did not present defense evidence.

*Verdict and Sentence*

The jury found defendants guilty on all charged counts and found true all firearm enhancement allegations with the exception of the section 12022.53, subdivision (b), firearm enhancement allegation asserted against Cotton in connection with count seventeen.

The trial court sentenced Way to 61 years to life plus a determinate term of 47 years, calculated as follows: 25 years to life on count twelve plus 10 years for the section 12022.53, subdivision (b) firearm enhancement, 15 years to life on count eleven plus 10 years for the section 12022.53, subdivision (b) firearm enhancement and four years for the section 12022.3 enhancement attached to count eleven, with the enhancement sentences stayed pursuant to section 654, seven years to life on counts one and five plus one year each for the section 12022, subdivision (a)(1) firearm enhancements attached to those counts, seven years to life on count thirteen plus 10 years for the section 12022.53, subdivision (b) firearm enhancement, seven years to life on count fourteen and 10 years for the section 12022.53, subdivision (b) firearm enhancement, those sentences stayed pursuant to section 654, the upper term of four years on count sixteen, the principal determinate term, plus 10 years for the section 12022.5 subdivision (a) firearm enhancement, two years four months, or one-third the midterm on count two, stayed pursuant to section 654, two years on count three, plus four months for the section 12022 subdivision (a)(1) firearm enhancement, one year four months, or one-third the midterm on count four, stayed pursuant to section 654, one year four months on count six, two

14

years on count seven plus four months for the section 12022, subdivision (a)(1) enhancement, one year on count nine plus four months for the section 12022, subdivision (a)(1) enhancement, one year on count ten plus three years four months for the section 12022.53, subdivision (b) enhancement, those sentences stayed pursuant to section 654, one year on count fifteen plus four months for the section 12022, subdivision (a)(1) enhancement, eight months on count seventeen plus four months for the section 12022, subdivision (a)(1) enhancement, and one year on count eighteen plus four months for the section 12022, subdivision (a)(1) enhancement.

The court sentenced Cotton to 14 years to life plus a determinate term of 35 years, calculated as follows:  seven years to life on counts one and five, one year each for the section 12022, subdivision (a)(1) enhancements attached to those counts, the upper term of five years on count eighteen, the principal determinate term, plus 20 years on the section 12022.53, subdivision (c) enhancement attached to that count, two years stayed on count two and four months stayed on the section 12022, subdivision (a)(1) enhancement attached to that count, two years on count three plus four months on the section 12022, subdivision (a)(1) enhancement attached to that count, one year four months stayed on count four, two years on count seven plus four months on the section 12022, subdivision (a)(1) enhancement attached to that count, one year four months on count eight, one year on count fifteen plus four months on the section 12022, subdivision (a)(1) enhancement attached to that count, and eight months on count seventeen.

In orally pronouncing judgment, the trial court misspoke, stating that the 20-year enhancement term on count eighteen was imposed pursuant to subdivision (b) of section 12022.53, rather than subdivision (c) of that section.  The abstract of judgment reflects this error.  The oral pronouncement of judgment for Cotton also states that the aggregate prison term is 14 years to life plus a determinate term of 35 years *eight months*.  This is incorrect.  As set forth *ante*, the aggregate determinate term is 35 years.  We shall modify

15

the oral pronouncement of judgment to reflect the correct sentencing and order the abstract corrected.

DISCUSSION

*Way's Appeal*

I

*Sufficiency of the Evidence of Aggravated Kidnapping (Count One)*

Defendants were charged in count one with kidnapping to commit robbery. (§ 209, subd. (b).)

Section 209, subdivision (b)(1), provides that "[a]ny person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

Way asserts the robbery of J.H. was complete before the perpetrators moved him and therefore substantial evidence does not support the determination that J.H. was kidnapped for the purpose of, and with the intent of, committing robbery. Way argues that, if the taking on which the robbery was based was the taking of items from J.H. before he was moved, "there was simply no evidence of asportation or movement." According to Way, there "was no evidence that [J.H.] was robbed again after he entered the house." In this regard, Way maintains that the items taken from the house "were products of a burglary, and not a robbery" because there "was just no evidence that the items taken after they entered the house were in [J.H.'s] 'possession' or 'immediate presence.' " Cotton joins Way in these arguments.

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must

16

determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).)  In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Penunuri* (2018) 5 Cal.5th 126, 142, italics added.)

While J.H. was in his driveway, the group approached him, one of whom was pointing a gun at J.H.'s head.  One of the men grabbed J.H. by his head and forced his head towards the ground.  The person who was holding a gun put it to J.H.'s head.  Others searched J.H.'s pockets.  They took J.H.'s cell phone, wallet, and the keys to his Honda.  They then moved J.H. into his house through the garage and a door leading from the garage into the house.

Inside the house, one of the men asked J.H. where he could find guns and jewelry.  The men looked for items in the master bedroom.  The man who had a gun took J.H. to the living room where his family was.  Thereafter, two men continued to search the house for items to take while the other two men guarded the family in the living room.  The men took items from the house, including video cameras, a tablet, a small chest

17

containing antique coins, and wedding bands. One of the men took an inhaler from I.H., who was in the living room with J.H.

Our high court has stated: "something is in a person's 'immediate presence' if it is ' " 'so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.' " ' [Citations.] 'Under this definition, property may be found to be in the victim's immediate presence "even though it is located in another room of the house, or in another building on [the] premises." ' " (*People v. Johnson* (2015) 60 Cal.4th 966, 989 (*Johnson*), quoting *People v. Hayes* (1990) 52 Cal.3d 577, 626-627 (*Hayes*).) "A trier of fact may infer the intent to steal from all the direct and circumstantial evidence." (*People v. Jackson* (2016) 1 Cal.5th 269, 345.)

Substantial evidence supports the conclusion that the movement of J.H. occurred in an effort by the perpetrators to continue the robbery inside the house by continuing to take items from J.H. and his immediate presence. Items owned by J.H. taken from other rooms in the house while J.H. was in the living room were items taken from his "immediate presence" as our high court has defined that term. (*Johnson, supra*, 60 Cal.4th at p. 989; *Hayes, supra*, 52 Cal.3d at pp. 626-627.) A reasonable juror could infer that continuing the robbery of J.H. was the perpetrators', and specifically defendants', intent when they moved J.H. from the driveway into the house. (See generally *Jennings, supra*, 50 Cal.4th at pp. 638-639 [we presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence; if the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding].)

Substantial evidence supports the verdict on count one.

## II

### *Sufficiency of the Evidence of First Degree Robbery*

Essentially repeating the above arguments, Way (with Cotton joining) asserts the conviction on count two, first degree robbery of J.H., should be reduced from first to second degree robbery because the evidence was insufficient to establish that the robbery occurred inside an inhabited dwelling house.  Defendants assert that the robbery of J.H. occurred, and was completed, outside of the house.  Thus, while there were additional items taken from within the house, defendants assert that there was no evidence that J.H. was " 'robbed' " of these items because there was no evidence those additional items were taken from J.H.'s possession or immediate presence.

We have largely addressed this argument.  First degree robbery, insofar as relevant here, includes "every robbery which is perpetrated in an inhabited dwelling house . . . ." (§ 212.5, subd. (a).)  We concluded *ante* that substantial evidence supported the determination that the asportation of J.H. from the driveway into the house was undertaken with the intent to rob him in the house.  We further concluded that items taken from other rooms in the house while J.H. was in the living room were items taken from his "immediate presence" as our high court has defined that term.  (*Johnson, supra*, 60 Cal.4th at p. 989; *Hayes, supra*, 52 Cal.3d at pp. 626-627.)  Thus, substantial evidence supported the jury's determination that defendants were guilty of first degree robbery on count two because the robbery was "perpetrated in an inhabited dwelling house." (§ 212.5, subd. (a).)

## III

### *Sufficiency of the Evidence of Aggravated Kidnapping (Count Thirteen)*

Way asserts that his conviction on count thirteen of aggravated kidnapping of A.P. was not supported by substantial evidence.  He asserts that, because A.P. suggested that she and Way go in her car to an ATM, the evidence was insufficient to establish all

19

elements of kidnapping. According to Way, the evidence does not establish that the asportation of A.P. was accomplished by means of force or fear: "[t]here was simply no evidence that [Way] compelled [A.P.] to take this trip."

Again, any person who kidnaps or carries away another person to commit robbery is guilty of aggravated kidnapping. (§ 209, subd. (b)(1).) More generally, "[e]very person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a).) "Thus, kidnapping requires the asportation of the victim accomplished by force or instilling fear." (*People v. Alvarez* (2016) 246 Cal.App.4th 989, 1002 (*Alvarez*), citing *People v. Majors* (2004) 33 Cal.4th 321, 326 (*Majors*).) "This does not require physical compulsion. [Citation.] Rather, where the victim reasonably feels compelled under the circumstances to comply with the defendant's orders under fear of harm or injury from the defendant, the asportation is forcible." (*Alvarez*, at p. 1002, citing *Majors*, at pp. 326-327.) "Additionally, where a victim consents to the movement, meaning he or she exercises his or her free will in the absence of threats, force, or duress, there is no kidnapping." (*Alvarez*, at p. 1002.) However, "[k]idnapping does not require that the victim express some form of protest or resistance." (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 477.)

The evidence established that, while A.P. waited for M.T. to return from another area of the park, she suddenly realized two men were approaching her, one of whom was Way. She saw M.T. on his knees and someone was pointing a gun at his head. After grabbing A.P.'s phone and pulling out a gun, Way repeatedly said he wanted to have sex with A.P. and began to grope her. He put his hands in her shirt, touching her breasts beneath her bra, and put his hand down her pants. He put his finger in A.P.'s vagina for 10 to 15 seconds. The men were trying to figure out what of value they could take from A.P., but she did not have anything. She suggested they take her car. Way stayed with

20

her while the others went and ransacked her car, but they did not find anything. A.P. said she had a student Visa and told them she could try to "pull money off of it." One of the men told Way, "take her to go get the money off her Visa, and if she doesn't, then off her," meaning kill her. A.P. just wanted "to get away from them all together and . . . get home to my kids." She also testified that she "wanted to try to get them away from one another because I thought they would hurt me more because I didn't have anything." A.P. and Way got into her car. He directed her where to go. He also told her not to try anything. A.P. took this as a threat. They eventually arrived at the ATM.

Viewing the evidence in the light most favorable to the judgment, we conclude substantial evidence supports the guilty verdict on count thirteen. (See generally *Jennings, supra*, 50 Cal.4th at pp. 638-639.) Under the circumstances described above, substantial evidence supports the determination that A.P. complied with Way under fear of harm or injury. She saw that Way had a gun when he approached her in the park, and she was sure he still had the gun when they were in her car. He had already groped A.P.'s breasts and inserted his finger into her vagina, at which point A.P. testified that she was avoiding eye contact with him and she feared she was going to die. The perpetrators demanded anything of value from A.P. When the prosecutor asked on redirect what demands were made of her prior to her suggestion that she take her car to an ATM, A.P. testified that "[t]hey wanted any money, possessions I could get or give them that I had on me." We conclude that a reasonable juror could determine that A.P. "reasonably [felt] compelled under the circumstances to comply with the defendant's orders under fear of harm or injury from the defendant . . . ." (*Alvarez, supra*, 246 Cal.App.4th at p. 1002; accord, *Majors, supra*, 33 Cal.4th at pp. 326-327.)

Way insists that the verdict is not supported by substantial evidence because A.P. suggested the trip to the ATM. Way's contention ignores all of the circumstances other than the fact that A.P. raised the possibility of getting cash from an ATM. The fact that, under these circumstances, A.P. suggested that she take one of the perpetrators to an

21

ATM to withdraw money from her Visa card did not establish the absence of force or fear. Rather, under threat from an armed group of youths, including defendant armed with a gun, demanding any property she had, and, at one point, holding her long-time friend at gunpoint, A.P. determined that her best hope for survival was to seem to comply with the perpetrator's demands for property by taking one of them to an ATM. By doing so, according to her own testimony, she hoped to separate the perpetrators from one another "*because [she] thought they would hurt [her] more because she didn't have anything*." (Italics added.)

In his reply brief, Way emphasizes the language from case law standing for the proposition that "where the victim reasonably feels compelled under the circumstances *to comply with the defendant's orders* under fear of harm or injury from the defendant, the asportation is forcible." (*Alvarez, supra*, 246 Cal.App.4th at p. 1002, italics added.) Relying on this language, Way emphasizes that there is no evidence that he *ordered* A.P. to go to the ATM, but instead doing so was "her idea and hers alone."

Way's literal reading of this case law is not persuasive. Section 207, subdivision (a), defining kidnapping, provides that "Every person who forcibly, *or by any other means of instilling fear*, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (Italics added.)

Here, A.P. was confronted by a group, at least two of whom were armed with guns, and they demanded property. One of the group held A.P.'s friend on his knees at gunpoint. Way, armed with a gun, groped A.P.'s breasts, inserted his finger in her vagina, and grabbed her phone. When she raised the idea of the trip to an ATM, one of the perpetrators told Way to "off" her, meaning kill her, if she was not forthcoming with money. Additionally, once in the car, Way directed A.P. exactly where to go. He also told her not to try anything, which she took as a threat. She was certain he still had a gun in the car. We cannot conclude that A.P. who, fearing for her life, suggested going to an

22

ATM to procure cash to give to the armed men attempting to rob her, was not taken by means of instilling fear sufficient to satisfy the requirements of sections 207 and 209 just because Way never explicitly *ordered* her in so many words to take him to an ATM.

Inasmuch as Way is asserting that A.P. consented to take him to the ATM to procure cash, "[f]or purposes of kidnapping, one has not consented unless acting 'freely and voluntarily and not under the influence of threats, force or duress.' " (*Alvarez, supra*, 246 Cal.App.4th at p. 1006, quoting *People v. Davis* (1995) 10 Cal.4th 463, 517.) Substantial evidence set forth *ante* supports the determination that A.P. was not acting freely and voluntarily, was under the influence of threats and duress, and did not consent.

Way's conviction on count thirteen is supported by substantial evidence.

IV

*Eyewitness Identifications as the Primary Evidence Supporting Counts One Through Five*

Way asserts that, because the convictions on counts one through five related to the victims J.H., E.H., and I.H. rested entirely on eyewitness identifications, and because those identifications were inherently unreliable, the evidence to support these convictions was insufficient. Way asserts that the identifications were made under stressful circumstances based on fleeting, fraught encounters, and further that the perpetrators had their faces covered and at the least kept their mouths covered. Way also emphasizes the passage of time between the charged offenses and the victims' trial testimony, the witnesses' lack of certainty in their identifications, and J.H.'s erroneous identification of another individual.

" 'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact could have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied.' [Citation.] '*Even when there is a significant amount of countervailing*

23

*evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.*' " (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411 (*Lucero*), quoting *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 (*Barnwell*), italics added.)

At trial, J.H. identified Way as one of the intruders. However, in a pretrial photo lineup which included Way's photograph, J.H. selected a filler photo.

E.H. identified Way at trial as one of the intruders. She testified that, during the incident, all four of the intruders had at least part of their faces covered, "just like the mouth." However, when questioned about her identification of Way, she testified that the "top of their faces look familiar. Like I said, it was only the mouth part, like you could see everything else." E.H. also viewed a pretrial photo lineup. She selected Way in that photo lineup, as one of the individuals who participated in the home invasion. However, she was not 100 percent certain.

Thus, here, two victims offered eyewitness testimony identifying Way as one of the intruders. As stated *ante*, " '[e]ven when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the [substantial evidence] standard is sufficient to uphold the finding.' " (*Barnwell, supra*, 41 Cal.4th at p. 1052; *Lucero, supra*, 41 Cal.App.5th at p. 411.)

Way asserts that these witnesses' trial identifications of him were "inherently improbable." Our high court has specified: "The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296 (*Scott*).) Importantly, we are not addressing the "uncorroborated testimony of a single witness." (*Ibid.*) J.H. and E.H. both independently identified Way, thus corroborating each other's identification.

Way asserts that the victims' opportunities to observe the home invaders were fleeting and under stressful conditions. However, both witnesses had an opportunity to observe Way. He was among the individuals who confronted J.H. in his driveway and

24

moved him into the house. J.H. testified that, once they were inside, he could see the perpetrators better because "inside the house they were not covered anymore in the face." Additionally, Way was one of the perpetrators who participated in the assault with intent to commit rape of E.H. She testified that, while the perpetrators mouths were covered, she "could see everything else." The record does not suggest that this particular incident was unusually fleeting or more stressful than a typical home invasion such that the victims' identification of Way was rendered inherently improbable.

More than the fleeting and stressful nature of the encounter, Way relies on "the timeline for how those identifications were made." He emphasizes that E.H. first chose his photo out of a lineup almost six months after the charged offenses, and did so tentatively, and then identified him in court almost two years after her photo identification and two and a half years after the incidents. Way also questions how J.H. could fail to identify his photo seven months after the incidents but reliably identify him at trial years later. As the Attorney General asserts, however, where a witness fails to identify a defendant in a pre-trial photographic lineup, but subsequently identifies the defendant in court, these circumstances go to the weight of the evidence, not its sufficiency. (*People v. Prado* (1982) 130 Cal.App.3d 669, 674 (*Prado*).)

Way has not identified anything in the record that suggests J.H.'s and E.H.'s identifications of him were inherently improbable. Substantial evidence, including J.H. and E.H.'s identification of Way, supports the verdicts on these counts.

V

*Eyewitness Identification as the Primary Evidence Supporting Count Eighteen*

Way makes the same arguments as to count eighteen and the victim W.E. as he makes above in reference to counts one through five. Way emphasizes that W.E.'s trial identification of him occurred two and a half years after the charged offenses. However,

25

a few days after the incident, W.E. was able to say, at most, that Way appeared "familiar."

Days after the incident at Robert Frost Park, W.E. viewed photo lineups. In one photo lineup, he picked out Cotton as the person who hit him with the gun. In the other photo lineup, he said Way looked familiar. At trial, W.E. identified Way as the person who was giving the orders during the encounter. As stated *ante*, where a witness fails to identify a defendant in a pre-trial photographic lineup, but subsequently identifies the defendant in court, these circumstances go to the weight of the evidence, not its sufficiency. (*Prado, supra*, 130 Cal.App.3d at p. 674.) Also as stated *ante*, " '[e]ven when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the [substantial evidence] standard is sufficient to uphold the finding.' " (*Barnwell, supra*, 41 Cal.4th at p. 1052; *Lucero, supra*, 41 Cal.App.5th at p. 411.)

Way has not identified anything in the record to demonstrate that W.E.'s identification of him as the person at the robbery giving the orders was inherently improbable. (*Scott, supra*, 21 Cal.3d at p. 296.) Substantial evidence supports the verdict on count eighteen.

VI

*Ineffective Assistance of Counsel*

Way argues that his trial attorney was constitutionally ineffective for failing to call an expert witness to testify about the inherent unreliability of eyewitness identifications as to counts one through five and eighteen. Way maintains that "it has long been understood that eyewitness identification is inherently unreliable" and "is of 'dubious reliability.' "

We note that, on two occasions in his briefing, Way quotes *People v. Foster* (1992) 6 Cal.App.4th 1, for the premise that "[e]yewitness testimony . . . is of dubious

26

reliability." (*Id*. at p. 15, fn. 1 (dis. opn. of Johnson, J.).) However, Way fails to note that his reliance is on the dissenting opinion, a relevant omission. A dissenting opinion, on its own, does not serve as precedential authority. (*Lafferty v. Wells Fargo Bank, N.A.* (2018) 25 Cal.App.5th 398, 425 (*Lafferty*); *Fischer v. Time Warner Cable Inc.* (2015) 234 Cal.App.4th 784, 797 (*Fischer*).)

Way also contends that there is no tactical reason for defense counsel not to call such an expert because "it would only have benefited the defense chances had one been hired."

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217; *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367.) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642], quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid*.) " ' "[T]rial counsel's tactical decisions are accorded substantial deference [citations], [and] . . . [a] reviewing court will not second-guess trial counsel's reasonable

27

tactical decisions." ' " (*People v. Maldonado* (2009) 172 Cal.App.4th 89, 97, quoting *People v. Riel* (2000) 22 Cal.4th 1153, 1185.)

"When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) However, "[e]xpert testimony on the psychological factors affecting eyewitness identification is often unnecessary." (*People v. Lewis and Oliver* (2006) 39 Cal. 4th 970, 995.) The decision whether to call certain witnesses is generally a matter of trial tactics (*People v. Bolin* (1998) 18 Cal.4th 297, 334), and a reviewing court will ordinarily not second-guess such decisions (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059).

The record does not expressly establish why Way's attorney did not call an expert on eyewitness identifications. Additionally, counsel was not asked about the matter. "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*); accord, *Mai, supra*, 57 Cal.4th at p. 1009.)

Way's trial counsel could have concluded deficiencies in the eyewitness identification of him by J.H., E.H., and W.E. could be sufficiently addressed through cross-examination and closing argument. Way's trial counsel cross-examined J.H. about whether he originally told responding officers that he did not get a good look at anyone and could not describe the perpetrators, whether the perpetrators' faces were covered, whether he did, in fact, give descriptions to officers on the night of the incident, and

28

whether he got a clear look at everyone as they were moving him into his house and whether he could see their faces.

Counsel cross-examined E.H. about whether one of the perpetrators had his face covered the entire time, how old the perpetrators looked, whether she took the time to get a really good look at the perpetrators, how much of their faces were covered, and how she could identify Way if his face was partially concealed. He cross-examined W.E. about his inability to positively identify Way in the photo lineup, how he could affirmatively identify Way in court if he could not positively identify him in the photo lineup and whether this was "because he is the only one in court," his opportunity to observe the perpetrators other than Cotton, who was at the driver's window, whether the perpetrators' faces were covered, and whether he initially told officers the three perpetrators other than Cotton were never in his line of sight.

Way's attorney also addressed the matter extensively in closing arguments. He argued that "some of the identifications . . . made a long time ago were maybe not as consistent as they were when somebody gets to court. Picking somebody out, saying I didn't get a description, I didn't see this. I saw some lineup pictures. I just want to remind you that it is easy to say they are in court, they are guilty. They are the ones that got charged. And even when a witness may be mistaken, sometimes I want this to be over, I want it to be that guy. So that is something for you to consider when you again consider a witness's testimony as you heard it from the witness stand."

Specifically with regard to the events that occurred in J.H.'s home, Way's attorney stated: "You can imagine trying to focus on a face or a description as opposed to a gun pointed in their face. In those moments, of course, people don't remember a lot of those things because they may be [focusing] on a gun and not a person or what they were wearing." With regard to W.E.'s identification, Way's attorney argued: "He was the last person that said it's them, it's them, I picked out the pictures. But I know we asked him several times and he told the original police officer there was only one person at his

29

window. He wasn't dealing with anybody else because nobody else was in his line of sight. That's what he told the officers. [¶] Then later on he changed everything, and by the time he got to court and started looking at lineup pictures, now he is able to identify somebody. But he told the police officer he couldn't see anybody, he didn't know who the other three people were. So I ask you to consider that as well when you are evaluating the credibility of [W.E.] as a witness, or anybody else."

Way's trial counsel also could have concluded that this eyewitness identification evidence could be sufficiently undermined through the trial court's instructions. The trial court instructed the jury with CALCRIM No. 315 on the jury's evaluation of eyewitness identification. That instruction directed the jurors to consider the following questions: "Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] Was the witness able to identify other participants in the crime? [¶] Was the witness able to identify the defendant in a photographic or physical lineup. [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification?" CALCRIM No. 315 also instructed the jurors: "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." A number of

the questions to be answered in connection with CALCRIM No. 315 were relevant to the eyewitness identifications here, and trial counsel may have concluded that this instruction addressed the matter sufficiently.

Moreover, counsel may have concluded that expert testimony would undermine the defense case. For example, on cross-examination, J.H. testified that, to an extent, he was able to describe the perpetrators to officers on the night of the incident. He also testified on cross-examination that he could see all of the perpetrators' faces once they were in his house. E.H. testified that only the perpetrators' mouths were covered, and that she could otherwise see their faces. The incident did not occur over a fleeting matter of seconds, but lasted minutes, 10 minutes according to E.H. J.H. testified that he clearly saw the perpetrators faces and could describe them. W.E. testified that the perpetrators' faces were not covered, that he was "pretty good with faces," and that he had the opportunity to observe Way because he "got into the window of the car like once or twice and going back to the other guys in the back." Given this evidence, defense counsel may have concluded that certain factors about which an expert would testify which could enhance the reliability of an eyewitness identification, such as the time to observe a perpetrator and the ability to clearly see a perpetrator's face, were present in this case, and thus the expert's testimony could reinforce the identifications and thus prove harmful to Way's case. Relatedly, counsel may have concluded that the prosecution's cross-examination of an expert on eyewitness identification could have highlighted the foregoing evidence, thus undermining Way's case.

Finally, trial counsel may have concluded that the matter was sufficiently addressed, through cross-examination, jury instructions, and argument, such that the already lengthy trial should not be prolonged by producing an expert witness on matters already before the jurors.

31

Thus, it cannot be said that "there could be no satisfactory explanation" (*Anderson, supra*, 25 Cal.4th at p. 569; accord, *Mai, supra*, 57 Cal.4th at p. 1009) for counsel's decision not to present expert testimony on eyewitness identifications.

Defendant analogizes his trial counsel's failure to call an expert on eyewitness identification here to the failure of trial counsel to call an expert on battered women's syndrome (BWS) in *People v. Day* (1992) 2 Cal.App.4th 405 (*Day*), disapproved on another ground in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089.

Even if presentation of expert testimony on the subject matter was analogous, the circumstances are far from it. In *Day*, the defendant moved for a new trial, represented by different counsel than her trial attorney, "on the ground appellant did not receive constitutionally adequate representation because her trial counsel had been unaware of and made no effort to explore the implications of her status as a battered woman." (*Day, supra*, 2 Cal.App.4th at p. 412.) "Several affidavits were filed in support of appellant's motion. First, trial counsel . . . admitted in court and in letters on file with the court that he was unaware of the existence of BWS before and during trial and never considered investigation, research, or presentation of expert witness testimony regarding BWS on appellant's behalf. In a letter to the court, [counsel] stated: 'Were I proceeding to trial with this case, I would, of course, use [an identified] expert.' " (*Ibid*.) The declaration of an expert witness established that the expert had successfully used witness testimony of another expert to obtain an acquittal on self-defense grounds in a homicide case. (*Ibid*.) Another psychologist submitted an affidavit concluding that the defendant did, indeed, suffer from BWS. (*Id*. at pp. 412-413.) A counselor with extensive experience in the field of domestic violence also concluded that the defendant suffered from BWS. (*Id*. at p. 413.)

The "trial court denied appellant's new trial motion. The court ruled appellant had established counsel was ineffective in failing to investigate and to present evidence of the BWS. However, the court found appellant had not been prejudiced by counsel's

32

failings." (*Day*, *supra*, 2 Cal.App.4th at p. 414.) Ultimately, the appellate court reversed that determination, concluding that the defendant was prejudiced by his counsel's performance. (*Id*. at p. 420.)

Unlike the circumstances in *Day*, here, the issue of the reliability of eyewitness testimony was addressed by court instructions, was explored thoroughly in the cross-examination of witnesses, and was argued extensively to the jury. Moreover, we have identified a number of reasons counsel may have chosen to forego expert testimony.

We conclude that Way's trial attorney's performance was not deficient for failure to present an expert on eyewitness identification. In light of this determination, we need not address prejudice. (*Strickland, supra*, 466 U.S. at p. 697 ["there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one"].) We conclude that Way was not deprived of the constitutionally effective assistance of counsel.

VII

*Senate Bill No. 620*

On January 1, 2018, Senate Bill No. 620 (SB 620) became effective. (Stats. 2017, ch. 682, §§ 1-2.) That measure vested the court with authority to exercise its discretion to strike firearm enhancements imposed under section 12022.53. (§ 12022.53, subd. (h).) Way asserts that, following the passage of SB 620, the matter must be remanded to afford the trial court the opportunity to exercise its discretion to strike his firearm enhancements. As discussed in the following part of our Discussion, *post*, we are vacating Way's sentence and remanding for resentencing because his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. Therefore, his contention pursuant to SB 620 here is rendered moot and he can raise these arguments on resentencing.

33

## VIII

*Eighth Amendment Cruel and Unusual Punishment*

Way contends that his sentence, 61 years to life plus a determinate term of 47 years, constitutes cruel and unusual punishment. Way emphasizes that he was 17 years old during the commission of these offenses. He further emphasizes that recent United States Supreme Court and California Supreme Court Eighth Amendment case law takes into consideration the fact that the brains of juveniles are not fully developed.

"The Eighth Amendment ban on cruel and unusual punishment 'flows from the basic " 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " ' " (*People v. Contreras* (2018) 4 Cal.5th 349, 359 (*Contreras*), quoting *Roper v. Simmons* (2005) 543 U.S. 551, 560 [161 L.Ed.2d 1] (*Roper*).) "The United States Supreme Court has interpreted the Eighth Amendment to impose unique constraints on the sentencing of juveniles who commit serious crimes. This case law reflects the principle that 'children are constitutionally different from adults for purposes of sentencing.' " (*Contreras*, at p. 359, quoting *Miller v. Alabama* (2012) 567 U.S. 460, 471 [183 L.Ed.2d 407] (*Miller*).) "From this principle, the high court has derived a number of limitations on juvenile sentencing: (1) no individual may be executed for an offense committed when he or she was a juvenile" (*People v. Franklin* (2016) 63 Cal.4th 261, 273-274 (*Franklin*), citing *Roper*, at p. 578); "(2) no juvenile who commits a nonhomicide offense may be sentenced to LWOP" (*Franklin*, at p. 274, citing *Graham v. Florida* (2010) 560 U.S. 48, 74 [176 L.Ed.2d 825] (*Graham*)), "and (3) no juvenile who commits a homicide offense may be automatically sentenced to LWOP" (*Franklin*, at p. 274, citing *Miller*, at p. 465).

As was the case in *Contreras*, the "second limitation is relevant here: Because [Way] committed nonhomicide offenses, the Eighth Amendment does not permit [him] to be sentenced to LWOP. Although [he] may be punished with [a] long sentence[], [he]

34

must have 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (*Contreras*, *supra*, 4 Cal.5th at pp. 359-360, quoting *Graham*, at p. 75.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our high court "held that a juvenile defendant's sentence of 110 years to life for three counts of attempted murder was the functional equivalent of LWOP and, under *Graham*, violated the Eighth Amendment." (*Contreras, supra*, 4 Cal.5th at p. 360, citing *Caballero*, at p. 268.) Our high court "rejected the argument that *Graham*'s prohibition on LWOP does not apply to aggregated sentences for distinct crimes where each sentence individually provides for the possibility of parole within a juvenile's expected lifespan." (*Contreras*, at p. 360, citing *Caballero*, at pp. 267-268.) In doing so, our high court stated: "*Graham*'s analysis does not focus on the precise sentence meted out. Instead, . . . it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." (*Caballero*, at p. 268.)

With exceptions not applicable here, section 3051 provides an opportunity for a juvenile offender to be released on parole by requiring the Board of Parole Hearings (the Board) to conduct "youth offender parole hearing[s]" on a set schedule depending on the length of the juvenile offender's sentence. Specifically, youth offender parole hearings are to be held during the 15th year of incarceration for a juvenile offender serving a determinate sentence (§ 3051, subd. (b)(1)), during the 20th year of incarceration for a juvenile offender serving a life term less than 25 years to life (§ 3051, subd. (b)(2)), and during the 25th year of incarceration for a juvenile offender serving a life term of 25 years to life (§ 3051, subd. (b)(3)).

Thus, "25 years is the maximum amount of time that a juvenile offender may serve before becoming eligible for parole." (*Franklin*, *supra*, 63 Cal.4th at p. 278.) Section 4801, subdivision (c) directs that, in determining suitability for parole, the board "shall give great weight to the diminished culpability of youth as compared to adults, the

35

hallmark features of youth, and any subsequent growth and increased maturity of the prisoner." Subsequent to the enactment of the provisions in sections 3051 and 4801, the California Supreme Court decided *Franklin, supra,* 63 Cal.4th 261, which held that these provisions providing for youth offender parole hearings rendered moot Eighth Amendment cruel and unusual punishment claims asserted under *Graham/Miller/Caballero*. (*Id*. at pp. 268, 276-277, 280.)

In his original briefing, Way acknowledged *Franklin* and attempted to distinguish it, asserting his sentence was "infinitely longer" than Franklin's. The Attorney General contended *Franklin* rendered Way's Eighth Amendment claim moot.

The parties apparently overlooked the fact that Way was sentenced, in part, pursuant to section 667.61, known as the "One Strike law." We requested supplemental briefing from the parties on whether Way would be ineligible for a section 3051 youth offender parole hearing because, on count twelve, he was sentenced pursuant to section 667.61 to a term of 25 years to life and, if so, whether that established his Eighth Amendment claim was not rendered moot under *Franklin*.

In his supplemental briefing, Way asserts that, because he was sentenced pursuant to section 667.61, based on the language of section 3051, he will not be entitled to a youth offender parole hearing, and, therefore, his Eighth Amendment claim has not been rendered moot. The Attorney General concedes Way will not be entitled to a youth offender parole hearing pursuant to section 3051, and, thus, his Eighth Amendment claim is not rendered moot as a result of *Franklin*. We agree.

Subdivision (h) of section 3051 specifically provides that its provisions do not apply to cases in which sentencing occurs pursuant to, among other sections, section 667.61. Pursuant to count twelve, rape (§ 261, subd. (a)(2)), the jury found true, among other things, the allegation that, during the commission of the rape, Way also committed aggravated kidnapping within the meaning of section 667.61, subdivision (d)(2). The trial court sentenced Way to 25 years to life on count twelve, a sentence which

necessarily was imposed pursuant to section 667.61, subdivision (a), based on the jury's finding. Having been sentenced pursuant to section 667.61, Way will not be entitled to a youth offender parole hearing. (§ 3051, subd. (h).) Therefore, despite the holding in *Franklin, supra*, 63 Cal.4th 261, based on Way's circumstances, his Eighth Amendment claim is not rendered moot by the enactment of section 3051.

We also requested the parties to address in their supplemental briefing the impact of *Contreras, supra*, 4 Cal.5th 349, on Way's Eighth Amendment claim. In *Contreras*, the two defendants "were convicted in a joint trial of kidnapping and sexual offenses they committed as 16 year olds. Rodriguez was sentenced to a term of 50 years to life, and Contreras was sentenced to a term of 58 years to life." (*Contreras*, at p. 356.) Our high court "granted review to determine whether the sentences imposed on these juvenile nonhomicide offenders violate the Eighth Amendment . . . as interpreted in" *Caballero* and *Graham*. (*Contreras*, at p. 356.) Our high court held that the sentences imposed on the defendants were in violation of the Eighth Amendment under the reasoning in *Graham*. (*Contreras*, at p. 356.)

Immediately before undertaking its substantive analysis, our high court noted the defendants in that case, like Way here, were sentenced pursuant to the One Strike law, and that a "youth offender parole hearing is not available to juveniles convicted under the One Strike law. . . ." (*Contreras, supra*, 4 Cal.5th at p. 359.) Therefore, because the issue was not rendered moot by section 3051 and *Franklin*, the court proceeded to the merits of the Eighth Amendment claim. (*Contreras*, at p. 359.)

According to our high court, the specific question implicated in *Contreras* was "whether Rodriguez's sentence of 50 years to life or Contreras's sentence of 58 years to life for nonhomicide offenses violates the same Eighth Amendment principles that bar the imposition of LWOP for their crimes." (*Contreras, supra*, 4 Cal.5th at p. 360.) Ultimately, a majority of our high court concluded that the defendants' sentences violated the Eighth Amendment under the standards set forth in *Graham*. (*Contreras*, at p. 379.)

37

Way asserts that *Contreras* is controlling and his sentence must be deemed to constitute cruel and unusual punishment. We agree.

The defendants in *Contreras* committed their crimes when they were 16 years old. (*Contreras, supra*, 4 Cal.5th at p. 356.) Way committed these crimes when he was 17.

While we are reluctant to compare or qualify crimes out of sensitivity to the victims, if anything, the defendants' crimes in *Contreras* were, in some respects, even more egregious than Way's crimes. A jury convicted Contreras of conspiracy to commit kidnapping and forcible rape, rape by foreign object, two counts of kidnapping, seven counts of forcible rape, eight counts of forcible oral copulation, and two counts of sodomy by use of force, all against two victims, aged 15 and 16. The jury also found true allegations that Contreras committed the crimes with the use of a knife and that many of the sexual assault crimes were committed during a kidnapping, against more than one victim, and with a knife within the meaning of the One Strike law. (*Contreras, supra*, 4 Cal.5th at p. 357.)

As for Rodriguez, the other defendant in *Contreras*, a jury convicted him of two counts of kidnapping, two counts of forcible rape, four counts of forcible oral copulation, and two counts of sodomy by use of force. The jury found true allegations that Rodriguez committed the sexual assault crimes during a kidnapping and against multiple victims within the meaning of the One Strike law. (*Contreras, supra*, 4 Cal.5th at pp. 357-358.) Way's convictions are set forth fully *ante*.

"Rodriguez was sentenced to a term of 50 years to life, and Contreras was sentenced to a term of 58 years to life." (*Contreras, supra*, 4 Cal.5th at p. 356.) Our high court determined that, under the circumstances, these sentences violated the Eighth Amendment under the reasoning of *Graham*. (*Contreras*, at pp. 356, 379.) Way has been sentenced to 61 years to life plus a determinate consecutive term of 47 years.

In short, we perceive no principled distinction between Way's circumstances and those of the defendants in *Contreras* which, following *Contreras*, would render Way's

38

sentence constitutional under the Eighth Amendment. The fact that Way was 17 rather than 16 years old at the time of the offenses is not a sufficient distinction. It is the age of 18, not 17, " 'where society draws the line for many purposes between childhood and adulthood,' " such that " 'those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime.' " (*Contreras, supra*, 4 Cal.5th at p. 371, quoting *Graham, supra*, 560 U.S. at pp. 74-75.) Otherwise, Way's crimes were no more egregious than those committed by Contreras and Rodriguez, and his sentence is substantially longer. It would appear clear that, under *Contreras*, Way's sentence violates the Eighth Amendment.

The Attorney General does not contend that, in light of what we have discussed up to this point, Way's sentence would not violate the Eighth Amendment. The Attorney General "agrees that [Way] is entitled to a meaningful opportunity for release before the completion of his imposed terms . . . ." However, the Attorney General asserts that the Elderly Parole Program (§ 3055), discussed in *Contreras*, guarantees Way a meaningful opportunity for release at age 60. Therefore, the Attorney General urges Way's sentence is lawful because eventually he will receive a meaningful opportunity for release.

The Elderly Parole Program was enacted after oral argument in *Contreras*. (Stats. 2017, ch. 676, § 3.) Under the program, suitable prisoners 60 years old or older and who have served at least 25 years in prison may be entitled to a parole hearing. (§ 3055.) Our high court in *Contreras* requested supplemental briefing on what effect the program and related regulations had on the matter. (*Contreras, supra*, 4 Cal.5th at pp. 373-374.)

Ultimately, the majority in *Contreras* "decline[d] to resolve whether the newly enacted legislation and regulations affect the validity of defendants' sentences and instead le[ft] these novel issues for the lower courts to address in the first instance." (*Contreras, supra*, 4 Cal.5th at p. 374.) The court first stated that, while specified matters were to be taken into consideration in an Elderly Parole Program determination (§ 3055, subd. (c)), "[a] key question is whether an elderly parole hearing offers a juvenile

39

offender a 'meaningful opportunity to obtain release *based on demonstrated maturity and rehabilitation*' " as required under *Graham*.  (*Contreras*, at p. 374, quoting *Graham, supra*, 560 U.S. at p. 75.)

The majority stated that it was "declin[ing] to issue a definitive interpretation less than five months after the [Elderly Parole Program] statute's enactment, before any Court of Appeal has filed a published opinion applying it in the context of juvenile sentencing, and before CDCR has adopted any implementing regulations."  (*Contreras, supra*, 4 Cal.5th at p. 376.)  The court noted that the "record before us contains no information on how the Elderly Parole Program actually operates or what considerations, apart from the 'special considerations' set forth in the statute [citation], guide the Board's determination of suitability for elderly parole.  This information may be developed on remand."  (*Ibid*.)

The court further stated that, "[e]ven assuming that elderly parole hearings consider normal parole factors, it is not clear that elderly parole eligibility after 44 years in prison would provide the 16-year-old nonhomicide offenders in this case with the 'hope of restoration' and realistic opportunity to reintegrate into society that *Graham* requires."  (*Contreras, supra*, 4 Cal.5th at p. 377, quoting *Graham, supra*, 560 U.S. at p. 70.)

The *Contreras* majority echoed another concern raised by the defendants.  "Juvenile offenders for whom the Elderly Parole Program provides the first opportunity for release will invariably spend more time in prison before parole eligibility compared to adult inmates who committed the same crime and served at least 25 years before age 60—a result at odds with the high court's 'conclusion in *Roper v. Simmons*, [*supra*,] 543 U.S. 551 . . . , that juvenile offenders are generally less culpable than adults who commit the same crimes.' "  (*Contreras, supra*, 4 Cal.5th at p. 378.)

Thus, as stated, the majority determined that the issues surrounding the applicability of the Elderly Parole Program were "novel and substantial," more properly

addressed by the lower court in the first instance. (*Contreras, supra*, 4 Cal.5th at p. 378.) Accordingly, our high court remanded for resentencing, stating: "The sentencing court is directed to consider, in light of this opinion, any mitigating circumstances of defendants' crimes and lives, and the impact of any new legislation and regulations on appropriate sentencing. The sentencing court is further directed to impose a time by which defendants may seek parole, consistent with this opinion." (*Id*. at pp. 379, 383.)

The Attorney General relies on the Chief Justice's dissent in *Contreras*, which concluded that the Elderly Parole Program took the "defendants' sentences outside of *Graham*'s purview," rendering them lawful, not in violation of the Eighth Amendment. (*Contreras, supra*, 4 Cal.5th at p. 383 [dis. opn. of Cantil-Sakauye, C.J.].) As stated *ante*, a dissent, on its own, does not serve as precedential authority. (*Lafferty, supra*, 25 Cal.App.5th at p. 425; *Fischer, supra*, 234 Cal.App.4th at p. 797.)

The Attorney General asserts: "on the one hand, *Contreras* offers no binding precedent on this Court vis-à-vis the issue of the Elderly Parole Program, while on the other hand, it provides persuasive reasoning from three justices, including the Chief Justice, and reasoning that the remaining four justices found to be 'plausible,' for this Court to decide an issue of first impression." The Attorney General's reference to reasoning that four Justices of our high court found "plausible" is to a passage in the majority's discussion of the Chief Justice's dissent addressing the Elderly Parole Program. After discussing the dissent's opinion that all relevant matters would be considered at an Elderly Parole Program hearing, the majority stated that "the Chief Justice's interpretation is not the only plausible reading of the elderly parole statute . . . ." (*Contreras, supra*, 4 Cal.5th at p. 376.) This is not a signal of a consensus of a majority of our high court on the issue. We do not find this a sufficient basis on which to conclude, without more, that the Elderly Parole Program is sufficient to cure Eighth Amendment violations such as Way's sentence here.

41

Since *Contreras* was decided, very few published Court of Appeal cases have addressed *Contreras* and the Elderly Parole Program's effect on Eighth Amendment claims advanced by defendants who were juveniles when they committed their crimes. Up to this point, the cases have taken the same approach as a majority of our high court in *Contreras*, determining the matter is to be considered in the sentencing courts in the first instance.

In *In re Bolton* (2019) 40 Cal.App.5th 611, the petitioner was serving a 91-year sentence for crimes committed as a juvenile. (*Id.* at p. 614.) He was later convicted, as an adult, of an offense committed in prison, and sentenced to 25 years to life under the Three Strikes law, which disqualified him from the youth offender parole provisions of section 3051. (*In re Bolton*, at p. 614.) In a habeas corpus proceeding, the petitioner asserted his sentence violated the Eighth Amendment and sought to be resentenced on all convictions. (*Id.* at pp. 614, 620.) Applying *Contreras*, another panel of this court determined that the juvenile sentence of 91 years "would keep petitioner in prison for the rest of his life for crimes he committed as a juvenile, a violation of the Eighth Amendment." (*Id.* at p. 621.) A complication in *In re Bolton*—"what to do with petitioner's adult conviction and sentence"—is not implicated here. (*Ibid.*) Because the petitioner's juvenile sentence violated the Eighth Amendment, the court vacated the 91-year juvenile sentence and directed the sentencing court to "hold a sentencing hearing on his juvenile and adult convictions consistent with this opinion." (*Id.* at p. 625.) The court further stated: "if the trial court determines petitioner's total term must include a meaningful opportunity for parole, we leave it to the trial court to make the initial determination regarding what sentence satisfies this requirement, and the effect, if any, on the availability of elderly parole." (*Id.* at pp. 624-625.) Elsewhere, the court stated: "Since the Attorney General does not assert the possibility of elderly parole and there is nothing in the record regarding its application, we decline to address the issue and leave any analysis of this issue, if necessary, to the trial court on remand." (*Id.* at p. 621, fn. 3.)

42

In *People v. Garcia* (2018) 30 Cal.App.5th 316 (*Garcia*), the defendant was 17 when he committed the crimes of which he was convicted, and he was sentenced to a term of 94 years to life. (*Id*. at p. 319.) The defendant filed a petition for a writ of habeas corpus asserting his sentence violated the Eighth Amendment. (*Id*. at p. 320.) The trial court granted the petition and resentenced the defendant to a term of 50 years to life. (*Ibid*.) Defendant then contended that Proposition 57 required the Court of Appeal to vacate the sentence, conditionally reverse, and remand for a transfer hearing. (*Ibid*.) In *Garcia*, the court mentioned the Elderly Parole Program only in summarizing *Contreras*. (*Id*. at p. 326.)

After the court in *Garcia* requested supplemental briefing on *Contreras*, the Attorney General agreed with the defendant "that *Contreras* controls and that the matter must be remanded to the trial court for resentencing, assuming the case is transferred to adult criminal court following the [Proposition 57] transfer hearing." (*Garcia, supra,* 30 Cal.App.5th at p. 326.) In its disposition, in the event that the juvenile court determined it would have transferred the defendant to criminal court, the *Garcia* court directed, among other things: "The criminal court shall consider, in light of the opinion in *Contreras*, any mitigating circumstances of appellant's crimes and life, *and the impact of any new legislation and regulations on appropriate sentencing*. The court is further directed to impose a time by which appellant may seek parole, consistent with *Contreras*." (*Id*. at p. 330, italics added.)

The Attorney General has not given us any reason to chart a different course here. As was the case in *Contreras*: "The record before us contains no information on how the Elderly Parole Program actually operates or what considerations, apart from the 'special considerations' set forth in the statute [citation], guide the Board's determination of suitability for elderly parole. This information may be developed on remand." (*Contreras, supra*, 4 Cal.5th at p. 376, citing § 3055, subd. (c).)

43

We conclude that the matter must be remanded and Way resentenced consistent with this opinion and that of our high court in *Contreras, supra*, 4 Cal.5th 349.

*Cotton's Appeal*

I

*Proposition 57 Transfer Order*

After the verdicts were rendered but prior to sentencing, defendants moved to have their cases remanded to juvenile court for a juvenile transfer hearing pursuant to newly enacted Proposition 57. The prosecutor agreed, with stipulations. The stipulations included the following: "The first is that the defense . . . waive any and all procedural defects based on the suspension of the criminal proceedings on the adult Complaint and filing of a new juvenile petition . . . . [¶] Second, they are waiving any procedural irregularities in the sending of the case to Juvenile Court including but not limited to agreeing to waive any defect that might be caused by the statute of limitations and to waive any legal right to assert a statute of limitations defense based on the suspension of criminal proceedings on the adult court charging document and filing of a new juvenile petition. [¶] . . . [¶] And finally, the defense will agree and stipulate that should a transfer to adult court be granted and criminal proceedings reinstated after the transfer hearing, the case will proceed from the point at which it left adult court, in this case sentencing, and any rulings or motions on hearings previously litigated will stand."

"Proposition 57 prohibits prosecutors from charging juveniles with crimes directly in adult court. Instead, they must commence the action in juvenile court. If the prosecution wishes to try the juvenile as an adult, the juvenile court must conduct . . . a 'transfer hearing' to determine whether the matter should remain in juvenile court or be transferred to adult court. Only if the juvenile court transfers the matter to adult court can the juvenile be tried and sentenced as an adult." (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303.)

44

As to Cotton, after setting forth its determination as to each of the required factors to be considered, the juvenile court stated: "All things considered, based on the review specified criteria relative to proposition 57, the Court[] . . . recommends and orders that he be transferred to court of criminal jurisdiction and the matter be held before the adult court." The juvenile court granted the prosecution's motion pursuant to Welfare and Institutions Code section 707, subdivision (a)(1), and ordered Cotton transferred to adult criminal court.

Cotton asserts that his transfer hearing was defective and the court's determination to transfer him back to adult criminal court was not supported by substantial evidence.

"The right to appeal is statutory only, and a party may not appeal a trial court's judgment, order or ruling unless such is expressly made appealable by statute." (*People v. Loper* (2015) 60 Cal.4th 1155, 1159 (*Loper*).) "Appeals by criminal defendants are governed by section 1237 . . . ." (*Ibid*.) Nothing in section 1237 addresses juvenile court's rulings on transfer hearings. Such rulings are addressed in a different body of law. "The orders, judgments and decrees of a juvenile court which are appealable are restricted to those enumerated in [Welfare and Institutions Code] section 800." (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 709, disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1, 28.) Nothing in Welfare and Institutions Code section 800 authorizes an appeal from the juvenile court's decision on a transfer hearing. Thus, neither section 1237 nor Welfare and Institutions Code section 800 authorize Cotton, in the appeal from judgment in adult criminal court, to raise issues addressed to the juvenile court's determination granting the prosecution's motion pursuant to Welfare and Institutions Code section 707 to transfer Cotton back to the court of criminal jurisdiction.

As Cotton acknowledges, the authorized avenue for relief is found in California Rules of Court, rule 5.770. California Rules of Court, rule 5.770(g) provides, in part: "*An order granting or denying a motion to transfer jurisdiction of a child to the criminal court is not an appealable order. Appellate review of the order is by petition for*

45

*extraordinary writ.* Any petition for review of a judge's order to transfer jurisdiction of the child to the criminal court . . . must be filed no later than 20 days after the child's first arraignment on an accusatory pleading based on the allegations that led to the transfer of jurisdiction order." (Italics added.) Thus, the transfer ruling is not an appealable order, and challenges to that ruling must be raised in a petition for an extraordinary writ.

Cotton contends that the issue is cognizable on appeal because he was not arraigned in adult criminal court after a determination on his transfer hearing, and thus the predicate commencing his time to petition for relief never occurred. It is true that he was not arraigned in criminal court after the transfer order but rather was arraigned in adult criminal court long before the issue of Proposition 57 arose.

Cotton was not without recourse for review of the juvenile court's determination. Upon that court's rendering of its decision, Cotton could have availed himself of the procedure identified in California Rules of Court, rule 5.770(g). Under the unusual circumstances of this case, we assume, though we need not decide, that the time within which to file a petition for an extraordinary writ would begin to run upon Cotton's transfer back to the adult criminal court. If he wanted review of that determination, it was incumbent upon him to timely seek relief in the authorized manner. In any event, the fact that defendant was not arraigned in criminal court following his transfer hearing did not convert a nonappealable determination into an appealable one for present purposes. The procedural quirks of this case cannot vest us with the authority to consider a nonappealable matter.

Cotton asserts that it would be an idle act to require him to file a separate petition for relief rather than simply allowing him to raise this issue on appeal. However, again, the right of appeal is statutory "and a party may not appeal a trial court's judgment, order or ruling *unless such is expressly made appealable by statute.*" (*Loper, supra*, 60 Cal.4th at p. 1159, italics added.) Whether or not it would be more efficient for us to reach the issue on Cotton's direct appeal from his judgment is not relevant here.

46

Cotton further urges us to treat the issue as if it were raised by extraordinary writ. "An appellate court has discretion to treat a purported appeal from a nonappealable order as a petition for writ of mandate, but that power should be exercised only in unusual circumstances. [Citation.] 'A petition to treat a nonappealable order as a writ should only be granted under extraordinary circumstances, " 'compelling enough to indicate the propriety of a petition for writ . . . in the first instance . . . .' " ' " (*H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1366-1367 (*H.D. Arnaiz, Ltd.*).) "In *Olson v. Cory* (1983) 35 Cal.3d 390 . . . , the Supreme Court determined it was appropriate to treat an appeal from a nonappealable order as a petition for an extraordinary writ where requiring the parties to wait for a final judgment might lead to unnecessary trial proceedings, the briefs and record included in substance the necessary elements for a proceeding for a writ of mandate, there was no indication the trial court would appear as a party in a writ proceeding, the appealability of the order was not clear, and all the parties urged the court to decide the issue rather than dismiss the appeal. [Citation.] The court concluded that dismissing the appeal rather than exercising its power to reach the merits, would be ' " 'unnecessarily dilatory and circuitous.' " ' " (*H.D. Arnaiz, Ltd.*, at p. 1367.)

We decline to exercise our discretion to treat the matter is if it had been raised by extraordinary writ. While certain factors set forth above may be present, others are not. The parties are not required to wait for final judgment as Cotton could have petitioned for an extraordinary writ as contemplated by California Rules of Court, rule 5.770(g) prior to judgment, and unnecessary trial proceedings would not ensue. It is not entirely clear the briefs and record contain all necessary elements for a proceeding for a writ of mandate or if additional matter would be available on Cotton's petition for an extraordinary writ. Additionally, not all parties urge us to address the issue; the Attorney General maintains that it is not cognizable on direct appeal. We conclude that these are not the

47

extraordinary circumstances that would compel us to treat Cotton's raising of the issue on his direct appeal from the judgment to be a petition for an extraordinary writ.

In light of our determination, we do not address Cotton's contentions concerning the merits of the juvenile court's determination and its compliance with required procedure.

II

*Sufficiency of the Evidence of Aggravated Kidnapping (Count One)*

Returning to count one, aggravated kidnapping of J.H., Cotton asserts the movement of J.H. from outside to inside his house was merely incidental to the robbery. While Cotton acknowledges that J.H. was moved from outside to inside his house, he asserts that the only reason for this was "to gain access to the contents of the house, from which the group intended to steal property. The movement were [*sic*] not only incidental to the robbery, but essential." Cotton further asserts that the movement of J.H. did not increase the risk of harm to him beyond that already inherent in the crime of robbery.

Once again, section 209, subdivision (b)(1), provides that "[a]ny person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." However, to satisfy the asportation requirement, the movement of the victim must be "beyond that merely incidental to the commission of" the robbery, and the movement must "increase[] the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2); *People v. Simmons* (2015) 233 Cal.App.4th 1458, 1471 (*Simmons*).) "The statute previously required that the movement *substantially* increase the risk of harm to a victim, but it was amended in 1997 to require only that the movement increase the risk of harm, but not that the increase be substantial." (*Simmons,* at p. 1471.)

48

"As to whether the movement was more than merely incidental to the commission of the crime, 'the jury considers the "scope and nature" of the movement, which includes the actual distance a victim is moved. [Citations.] There is, however, no minimum distance a defendant must move a victim to satisfy . . . ' this element. [Citation.] As to whether the movement increased a victim's risk of harm, the jury considers ' " 'such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased.' " ' " (*Simmons, supra,* 233 Cal.App.4th at pp. 1471-1472.) The two prongs or elements—whether the movement was merely incidental to the robbery and whether it increased the risk of harm to the victim—"are not mutually exclusive but are interrelated." (*People v. Vines* (2011) 51 Cal.4th 830, 870 (*Vines*), overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103-104.) "[E]ach case must be considered in the context of the totality of its circumstances." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*).)

As to whether the movement was beyond that merely incidental to the robbery, Cotton concedes that J.H. was moved from the street outside his residence to a location inside his house. However, Cotton asserts that this movement was not merely incidental to the robbery, but essential to it, because, by the movement, the perpetrators gained access to the contents of the house.

After taking his trash cans to the curb, J.H. was confronted by defendants and their cohorts. One of the perpetrators pointed a gun at J.H.'s head. J.H.'s head was forced to the ground and the person with the gun put it to J.H.'s head. After taking items from J.H., the men took him inside his house through the garage. J.H. was approximately 29 feet from the door in the garage that led into the house when he first was confronted by the perpetrators. Thus, J.H. was moved 29 feet from the driveway into the house, and then moved within the house.

49

This movement was not merely incidental to the robbery of J.H. Like the case on which the Attorney General relies, J.H. was moved from his driveway into his house. (*Simmons, supra*, 233 Cal.App.4th at p. 1473 [in one instance, two victims were moved a significant distance up the front stairs and into the home, and in another, the victim was moved from his driveway, up the front stairs, into the house; ample evidence supports the jury's determination that the victims were moved more than incidentally].)

Cotton relies principally on *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*). As the court stated in *Simmons*, "In [*Daniels*], the victims were moved within their homes [citation], characterized by the court as 'brief movements' that were 'solely to facilitate' the defendants' crimes [citation]. The court concluded that 'when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence, as here, or a place of business or other enclosure—his conduct generally will not be deemed to constitute' aggravated kidnapping. [Citation.] Here, by contrast, the victims were moved from outdoors to inside under circumstances that increased harm and their risk of additional harm." (*Simmons, supra*, 233 Cal.App.4th 1472-1473.)

Similarly, in *People v. John* (1983) 149 Cal.App.3d 798 (*John*), the victim lived in a pool house on his parents' eight-acre property. (*Id*. at p. 801.) The defendant and his cohort confronted the victim and, during the course of the robbery, moved the victim what the public defender estimated to be 465 feet. (*Id*. at p. 803.) However, the appellate court concluded "that the movement in the present case is well within the *Daniels* rule," and insufficient to constitute a violation of section 209, "because [the victim] was never forced to move outside of the interconnected living quarters shared by him and his parents." (*Id*. at p. 805.) The court subsequently stated: "In this case, while [the victim] was initially confronted with an armed assailant, his subsequent treatment was not violent, he was not injured, and he was moved only on foot from place to place on the grounds and within his home while the crime was continued." (*Id*. at p. 806.)

50

In *People v. Killean* (1971) 4 Cal.3d 423 (*Killean*), our high court concluded that, "[i]n the course of robbing a jeweler and his companion in the former's apartment, [the defendants] caused them to move across the threshold and through various rooms in search of valuables. These movements were merely incidental to the robbery and did not substantially increase the risk of harm beyond that inherent in the robbery itself." (*Id*. at p. 424, citing *Daniels, supra*, 71 Cal.2d at p. 1139.)

Similarly, in *People v. Smith* (1971) 4 Cal.3d 426 (*Smith*), "[i]n the course of robbing a hotel, [the defendant] and his companions caused the night clerk to move about the office and up to a second-floor room, and a bellboy to move across that room. These movements were merely incidental to the robberies and did not substantially increase the risk of harm beyond that inherent in the robberies themselves." (*Id*. at p. 427, citing *Daniels, supra*, 71 Cal.2d at p. 1139.) Thus, like *Daniels* and *John¸* the movements in *Killean* and *Smith* involved movement within a dwelling or business, plus in *Killean* movement across the apartment threshold.

Here, unlike the cases on which Cotton relies, the movement of J.H. did not occur within the confines of a dwelling or business. Rather, he was moved from public view on his driveway into his house. The distance he was moved—at least 29 feet from the driveway area into his house and then to areas within his house—was less than, for example, the distance the victim was moved in *John*. However, although an assessment of whether the movement was merely incidental to the robbery should include a consideration of the actual distance the victim was moved, our high court has "repeatedly stated no minimum distance is required to satisfy the asportation requirement [citation], so long as the movement is substantial." (*Dominguez, supra*, 39 Cal.4th at p. 1152.) The robbery of J.H. could have been completed where defendants and their cohorts found him. However, instead of only robbing him of the possessions on his person, they chose to move him into his house. In so doing, they broadened the scope of their enterprise, both in terms of taking additional items belonging to J.H., but also in adding additional

51

victims and in expanding the nature of the crimes committed to include an assault with intent to commit rape of the victim E.H.

We conclude that the movement was not merely incidental to the commission of the robbery of J.H.

Cotton further asserts that the risk of harm was not increased by the movement of J.H. from outside into the house. We disagree.

" 'Under *Daniels*, the "risk of harm" factor refers to the risk created by the victim's movements that he will "suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed"; it does not refer to the increased risk that the crime of robbery will be committed.' " (*In re Earley* (1975) 14 Cal.3d 122, 131, superseded by statute on other grounds as stated in *Vines, supra*, 51 Cal.4th at p. 869 & fn. 20.) "The 'risk of harm' test is satisfied when the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon." (*In re Earley*, at p. 131, fn. omitted.)

J.H. was moved from his driveway which was open to view by the public to the inside of his house. From his driveway, there was the possibility that he could safely flee. In his house, he was confined in a much smaller space with four men, some or all of whom were armed. We are aware that J.H. in fact did flee from within the confines of his house. However, the possibility that he could do so was occasioned only by the fact that the perpetrators were focused on sexually assaulting J.H.'s daughter. This is hardly an argument in favor of the notion that the risk of harm did not increase by moving J.H. inside his house.

Thus, taking J.H. into his house decreased the likelihood of detection and increased the danger inherent in J.H.'s foreseeable attempts to escape. (See generally *Simmons, supra,* 233 Cal.App.4th at pp. 1471-1472.)

The movement also enhanced defendants' and their cohorts' opportunities to commit additional crimes. (See generally *Simmons, supra,* 233 Cal.App.4th at pp. 1471-

1472.)  The movement provided them access to multiple additional victims who were in the house.  Indeed, the movement resulted in defendants and their associates committing additional crimes, and, with regard to the assault with intent to commit rape involving E.H., crimes of a different character.

As stated in *Simmons*, the movement of the victim "allowed the defendants to engage in additional and more dangerous crimes by hiding their victims from public view and providing access to additional victims, and it increased the possibility of something going awry and somebody getting hurt.  [Citation.]  The movement not only increased the risk of harm to the victims, but it also caused additional harm in fact.  [One victim] testified about his understandably heightened fears when [the defendant] pushed a gun into his spine before they entered his home and when, once inside, he had to bear witness to threats to his family and friends." (*Simmons, supra,* 233 Cal.App.4th at p. 1472.)

Substantial evidence supports the verdict on count one.

III

*The Natural and Probable Consequences Doctrine*

The trial court instructed the jury with CALCRIM No. 402 on the natural and probable consequences doctrine.  Cotton contends that the natural and probable consequences doctrine impermissibly extends aider and abettor liability in violation of due process.  Cotton maintains that the natural and probable consequence doctrine is "inconsistent with more fundamental principles of our system of criminal law" because a defendant's liability is based on the fact-finder's determinations as to the actual perpetrator's mental state, regardless of the defendant's individual mental state.  Cotton asserts that, because the court's instruction allowed the jury "to find essential elements of the charges against [him] by reference to the intent and mental state of coperpetrators, and did not specify that [he] must have advance knowledge of the perpetrator's planned actions, this violated his right to due process under the Fourteenth Amendment . . . ."

53

Cotton asserts that the error in instructing the jury with the natural and probable consequences doctrine is reversible per se, or, at the least, cannot be deemed harmless beyond a reasonable doubt.

"Although the 'natural and probable consequences' doctrine has been 'subjected to substantial criticism' [citations], it is an 'established rule' of American jurisprudence." (*People v. Prettyman* (1996) 14 Cal.4th 248, 260 (*Prettyman*); see also *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) "It is based on the recognition that 'aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion.' " (*Prettyman*, at p. 260.) Our high court has rejected claims that the natural and probable doctrine is unconstitutional because it allows the jury to find a defendant vicariously liable and because it allows criminal liability based on a negligence standard. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 184-185 [rejecting contention, insofar as relevant here, that the "application of the natural-and-probable-consequences doctrine in a capital case is a violation of due process because it permits the jury to convict the defendant of the substantive charges and special circumstance allegations 'without a need to decide if he had the otherwise requisite intent' "]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 106-107 [rejecting contention that the natural and probable consequences doctrine is unconstitutional in capital cases because it predicates criminal liability on negligence, in violation of due process].) Cotton acknowledges that "earlier California decisions have upheld the 'natural and probable consequences' doctrine of aiding and abetting liability." However, he questions whether the doctrine remains valid "in light of more recent federal cases and law review articles." We are, of course, bound to follow our high court's determinations. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*).)

Cotton relies on *Rosemond v. United States* (2014) 572 U.S. 65 [188 L.Ed.2d 248] (*Rosemond*). In that case, a defendant was charged with aiding and abetting under a

federal statute that prohibited using a gun in connection with a drug trafficking crime. (*Id.* at p. 68.)  The high court held that, to be found guilty, the aider and abettor did not have to personally use or possess a gun, but he did have to know in advance of the crime that his confederate would carry one.  (*Id.* at pp. 74-75, 77-78.)  Cotton relies on *Rosemond* for the premise that an aider and abettor must "know in advance that his confederate has an intention to commit the greater crime" and that the aider and abettor must have "advance knowledge of the perpetrator's planned actions."

But, *Rosemond* did not consider the application or validity of the natural and probable consequences doctrine, and is thus inapposite.  Indeed, in a footnote, the high court explicitly stated that the natural and probable consequences doctrine was not an issue in the case and that the court was expressing no view on it.  (*Rosemond, supra,* 572 U.S. at p. 76, fn. 7.)

Cotton also relies on *Clark v. Jago* (6th Cir. 1982) 676 F.2d 1099.  However, while instructive and potentially persuasive, decisions of intermediate federal courts are not binding on California state courts, even on matters of federal constitutional law. (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352; accord, *People v. Zapien* (1993) 4 Cal.4th 929, 989.)  In light of binding authority from our high court, we need not address *Clark* further.  (See *Auto Equity Sales, supra*, 57 Cal.2d at p. 455.)

Cotton's contention that the natural and probable consequences doctrine is an unconstitutional violation of his right to due process, and therefore it was reversible error for the court to instruct the jury on the doctrine, is without merit.

IV

*Senate Bill No. 620*

As stated *ante*, on January 1, 2018, SB 620 became effective. (Stats. 2017, ch. 682, §§ 1-2.)  SB 620 vested the trial court with authority to exercise its discretion to strike firearm enhancements imposed under section 12022.53.  (§ 12022.53, subd. (h).)

55

SB 620 applies retroactively to Cotton, as it became effective before this case is final. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.)

Cotton asserts that, following the passage of SB 620, the matter must be remanded to afford the trial court the opportunity to exercise its discretion to strike the firearm enhancements. The Attorney General asserts that remand is not necessary, however, as the trial court clearly indicated it would not have stricken the firearm enhancements. Despite the enactment of SB 620, we need not remand if the "record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; see *People v. Jones* (2019) 32 Cal.App.5th 267, 272-273; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894.)

We review the trial court's statements and sentencing decisions to see if the court clearly indicated its intent not to strike the enhancement if it had the discretion to do so. In doing so, we include the trial court's remarks in sentencing Way because the trial court, in sentencing Cotton, expressly "incorporate[d] all the previous statements [it] made with regard to Mr. Way into Mr. Cotton's sentencing."

In sentencing Way, and in rejecting the recommendation in the probation report that the principal term imposed be the lower term based on Way's youth, the trial court referred to "the utter devastation, the hurricane of vicious crime that was conducted by Mr. Way and his cohorts, and the wreckage of lives that they left in their wake. . . . [¶] To come to a conclusion that somehow his age at a time should mitigate to a low term defies logic, reason, and any sense of justice." Discussing Way's youth as a factor in mitigation, the trial court stated: "I understand sympathy for a young person, 17, 18, 19, 20 years old, but to read the crime reports or to be familiar with the crime reports of what the victims suffered, particularly the females in this case, and to conclude that on the basis of age some mitigation should be granted, that calculation, in my view, is -- makes a mockery of any sense of just punishment."

Discussing factors in aggravation cited by the probation report, specifically that the "crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness" (Cal. Rules of Court, rule 4.421(a)(1)), the court stated: "Oftentimes that factor is cited in cases that are just sort of garden variety, run of the mill cases that do involve what we would see everyday in these courts as violent acts. [¶] This case actually perfectly fits that description because all of the acts, and not just one, not just two, not just five, these defendants repeatedly disclosed degrees of cruelty, viciousness, and callousness in their conduct. [¶] This is the -- the facts of this case should be in a footnote next to what does this factor look like? Because this crime fits this by definition."

Additionally, in discussing a particular evaluation performed on Way intended to measure future dangerousness, which resulted in a score in the midrange of five out of 10, the trial court stated: "The only question in my mind is what in the world would it take, what would you have to do in order to get a lot closer to the highest number than a five? [¶] To say this is a five out of ten in terms of future dangerousness is to completely ignore everything that happened during these crimes." The court subsequently stated that the factors in aggravation "clearly, and with any sense of reality far outweigh any factor in mitigation in this case of which the only one found is the defendant's age."

In imposing the determinate portion of the sentence, for the principal term, the trial court imposed the upper term. The trial court also selected the upper term on the section 12022.5, subdivision (a), firearm enhancement attached to count sixteen. The trial court imposed all sentences to run consecutively on all nonstayed offenses.

In sentencing Cotton, the trial court incorporated the statements it made in sentencing Way. The trial court then noted that "This crew absolutely devastated a community, terrorized it. The degree of depravity shown is immense, and the devastation is not able to be calculated in terms of lives ruined, completely altered, and any sense of fear or safety or peace forever exploded by the conduct of these defendants." In

57

discussing circumstances in aggravation, the court stated that the "actual adjectives of cruelty, viciousness, and callousness without a doubt define the conduct by the defendants in this case, and that is unusual." In imposing the determinate portion of the sentence, for the principal term, the trial court imposed the upper term. In imposing that term, the trial court stated, "[t]he five years is chosen based on all the facts and circumstances of this case, and it is my view that the factors in aggravation clearly and obviously outweigh any factors in mitigation. That is primarily to the first rule, the conduct and character of these crimes absolutely defines viciousness and cruelty." The trial court imposed all sentences to run consecutively on all nonstayed offenses.

We conclude that the trial court's statements at sentencing and its sentencing decisions clearly indicate the court would not have stricken Cotton's firearm enhancements even if it had the authority to do so. Accordingly, we will not remand his case to the trial court for the trial court to consider whether to exercise its discretion pursuant to SB 620.

## DISPOSITION

In C085784 (Way), the sentence is vacated and the matter is remanded to the trial court for resentencing. The sentencing court shall consider, in light of *Contreras*, any mitigating circumstances of Way's crimes and life, and the impact of any new legislation and regulations on appropriate sentencing. The court is further directed to impose a time by which Way may seek parole, consistent with *Contreras*. The court shall prepare an amended abstract of judgment reflecting Way's revised sentence and forward copies of the amended abstract to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed in all respects.

In C085813 (Cotton), the oral pronouncement of judgment is modified to reflect the firearm enhancement on count eighteen is imposed pursuant to subdivision (c) of section 12022.53 and that Cotton's aggregate prison term is 14 years to life plus a

58

determinate term of 35 years.  The court shall prepare an amended abstract of judgment reflecting that the enhancement imposed on count eighteen was under subdivision (c) of section 12022.53 and forward copies of the amended abstract to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed in all respects.


                                                      _____

HULL, Acting P. J.


I concur:


_____

MURRAY, J.

ROBIE, J., Concurring and Dissenting.

I concur with the majority as to defendant Latrale Dupree Way, I dissent as to defendant Anthony Maurice Cotton.

As to Cotton, the majority concludes "the trial court's statements at sentencing and its sentencing decisions clearly indicate the court would not have stricken Cotton's firearm enhancements even if it had the authority to do so." (Maj. opn., at p. 58.) I have a fundamental disagreement with the majority's reasoning. I do not believe I or any appellate court has the wisdom to determine what the trial judge would have done at a defendant's sentencing hearing if it had been aware of the full extent of its discretion under Senate Bill No. 620. "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act." (*In re Estrada* (1965) 63 Cal.2d 740, 745.)

With the enactment of Senate Bill No. 620 following Cotton's sentencing, the Legislature changed the calculus a trial judge must enter when determining whether a firearm enhancement is appropriate. Because of this change, anything the trial judge said at the time of sentencing is tainted by the policy considerations behind the law then in effect. " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

After taking into account the change in policy and after hearing argument from both sides, the trial court may feel differently than when it initially sentenced Cotton to the enhancements. Cotton should not be denied this opportunity. Accordingly, I would

1

remand for the trial court to exercise its informed discretion when sentencing Cotton to the firearm enhancements.

/s/
Robie, J.